**Nicholas J. Henderson, OSB#074027**
nhenderson@portlaw.com
Motschenbacher & Blattner, LLP
117 SW Taylor St., Suite 200
Portland, OR 97204
Telephone: (503) 417-0508
Facsimile: (503) 417-0528

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re<br><br>Evergreen Vintage Aircraft, Inc.<br><br>Debtor. | Case No. 14-36770-rld11<br><br>DEBTOR'S MOTION AND NOTICE OF INTENT TO SETTLE AND COMPROMISE PURSUANT TO FRBP 9019 AND NOTICE OF HEARING |

    Evergreen Vintage Aircraft, Inc. (the "Debtor"), as debtor in possession, hereby moves this Court under Fed Rule Bankr. Proc. 9019 for entry of an order approving the settlement agreement between the Debtor, Umpqua Bank, and various other parties that are connected to the Debtor or its affiliates.  In support of this motion, the Debtor represents the following:

    1.    On December 11, 2014 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, under case number 14-36770-rld11.

    2.    The Debtor is a holding company that owns the real estate and improvements that house the Evergreen Aviation and Space Museum ("EASM") in McMinnville, Oregon. Specifically, the Debtor owns the Aviation Building that houses the Spruce Goose, and the

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone:  (503) 417-0500
Fax:  (503) 417-0501

Theater Building which contains a large format theater used by the EASM to show educational and historical films.

3. The Debtor also owns 25 vintage aircraft, as well as personal property located in the Aviation Building, as well as miscellaneous personal property located in both the Aviation Building and the Theater Building.

4. The Debtor filed this case to prevent a foreclosure sale by Umpqua Bank ("Umpqua"), which would have resulted in the sale of 12 of the Debtor's most valuable aircraft holdings.

5. Umpqua asserts a security interest in the bulk of the Debtor's assets, including the Debtor's most valuable aircraft holdings, as well as the Debtor's real property. Umpqua asserts a claim against the Debtor in excess of $42,000,000.

6. Umpqua filed a motion for relief from stay on January 23, 2015. The Debtor disputes the validity of Umpqua's $42,000,000 claim, as well as the validity of Umpqua's security interest.

7. The Debtor, Umpqua, EASM, and several other parties attended a mediation on March 26th, 27th and April 6th. The result of the mediation was that the Debtor had an offer to sell all of its assets to a third party for $22,000,000, and had reached an agreement to settle with its largest creditors. In fact, the Debtor was able to reach agreement with all of its largest creditors, except for one: World Fuel Services, Inc.

8. Attached as Exhibit 1 is the term sheet that has been agreed upon by the Debtor, Umpqua, and various other parties. The proposed term sheet contains the specific details of the proposed settlement between the Debtor and its largest creditors.

9. The Debtor seeks approval of the proposed settlement, pursuant to FRBP 9019, as the Debtor believes the proposed settlement is in the best interest of the Estate.

WHEREFORE, the Debtor respectfully prays for an order:

PAGE 2- DEBTOR'S MOTION AND NOTICE OF INTENT TO SETTLE AND COMPROMISE PURSUANT TO FRBP 9019 AND NOTICE OF HEARING

**Motschenbacher & Blattner, LLP**
117 SW Taylor Street, Suite 200
Portland, OR 97204
Phone: (503) 417-0500
Fax: (503) 417-0501

1

2          1.     Approving the proposed settlement agreement set forth in the term sheet attached

3   as Exhibit 1; and,

4          2.     Granting any other relief the Court finds equitable and just under the

5   circumstances.

6

7   DATED:  April 23, 2015

8                                                    MOTSCHENBACHER & BLATTNER, LLP

9
                                                     By:/s/ Nicholas J. Henderson
10                                                       Nicholas J. Henderson, OSB No. 074027
                                                         nhenderson@portlaw.com
11                                                   117 SW Taylor Street, Suite 200
                                                     Portland, OR 97204
12                                                   Telephone:  (503) 417-0500
                                                     Facsimile:  (503) 417-0501
13                                                   Attorney for Debtor

14
    **YOU ARE NOTIFIED THAT A HEARING to consider and act on the above-referenced**
15  **Motion and Notice of Intent to Settle and Compromise pursuant to FRBP 9010**
    **WILL BE HELD AT May 19, 2015, at 1:30 PM, at 1001 SW Fifth Avenue, Suite 700,**
16  **Courtroom #3, Portland, OR 97204.  Testimony will be offered and received if admissible.**

17
    **YOU ARE FURTHER NOTIFIED that unless you file an objection to this notice no later**
18  **than 21 days after the service date, and set forth the specific grounds for the objection and**
    **your relation to the case, with the clerk of the court at 1001 SW Fifth Avenue, Suite 700,**
19  **Portland, OR 97204, the undersigned will proceed to take the proposed action, or apply for**
    **an order if required, without further notice or a hearing.**
20

21

22

23

24

25

26

PAGE  3-    DEBTOR'S MOTION AND NOTICE OF INTENT          **Motschenbacher & Blattner, LLP**
            TO SETTLE AND COMPROMISE PURSUANT                 117 SW Taylor Street, Suite 200
            TO FRBP 9019 AND NOTICE OF HEARING                      Portland, OR 97204
                                                               Phone:  (503) 417-0500
                                                                Fax:  (503) 417-0501

## GLOBAL SETTLEMENT AGREEMENT – TERM SHEET

This term sheet (the "Term Sheet"), dated as of April 22, 2015, describes the principal terms of a proposed global settlement (any final and fully executed settlement agreement between the Parties, a "Settlement Agreement") of certain claims among the parties signatory hereto (collectively, the "Parties"). This Term Sheet remains subject to final documentation to be agreed upon by the Parties. For the avoidance of doubt, all exhibits and schedules hereto are incorporated into this Term Sheet by reference.

| | |
|---|---|
| Parties: | Evergreen Vintage Aircraft, Inc. ("Vintage")[1]<br>Evergreen Holdings, Inc. ("Holdings")<br>Ventures Acquisition Company, LLC ("VAC")<br>Ventures Holdings, Inc. ("Ventures")<br>The Michael King Smith Foundation ("MKS")<br>The Estate of Delford M. Smith ("DMS Estate")<br>The Delford M. Smith Revocable Trust ("DMS Trust")<br>Evergreen Aviation and Space Museum and The Captain Michael King Smith Education Institute ("Museum")<br>Umpqua Bank ("Umpqua")<br>Alfred T. Giuliano, as Chapter 7 Trustee[2] ("Bankruptcy Trustee")<br>Andrew Martin ("Martin")<br>CF & Associates ("CFA")<br>Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden") |
| Structure | In the Vintage bankruptcy, under Bankruptcy Rule 9019 Vintage will seek approval of a settlement containing the terms herein along with approval of a corresponding Section 363 sale as described herein. In the event the Court enters a final nonappealable Order approving the Section 363 sale (the "Order"), after having already approved the settlement, the following actions will occur: |
| Vintage Asset Sale: | Upon entry of the Order, through a court-approved Section 363 sale, Vintage will sell, transfer, or otherwise convey substantially all of its assets, including twenty-four (24) Vintage aircraft identified on Schedule 1 hereto (the "Initial Vintage Aircraft") and potentially one other Vintage aircraft identified on Schedule 2 hereto (the "Additional Vintage Aircraft" and, together with the Aviation Building, the Theater |

---

[1] Vintage, Holdings, VAC, Ventures, MKS, the DMS Estate, the DMS Trust, the Museum, and Skadden shall collectively be referred to as the "DMS Parties").

[2] The Bankruptcy Trustee was appointed as the chapter 7 trustee by the United States Bankruptcy Court, District of Delaware, for the following debtors: Evergreen International Aviation, Inc. ("EIA"); Evergreen Aviation Ground Logistics Enterprise, Inc.; Evergreen Defense & Security Services, Inc.; Evergreen International Airlines, Inc.; Evergreen Systems Logistics, Inc.; Evergreen Trade, Inc.; and Supertanker Services, Inc. (collectively, the "Chapter 7 Debtors").

| | |
|---|---|
| | Building ("Vintage Buildings"), Vintage land, Vintage property plant and equipment, and any other Vintage artifacts, plus a permanent access to the Museum site where the current and old entrance and driveway are located to the buyers for a total purchase price of $22,000,000.00 (the "Purchase Price"). A copy of the sale term sheet is attached hereto as Exhibit A. In addition, for the avoidance of doubt, MKS will provide an easement over any of its lands to the extent necessary and appropriate.<br><br>The terms and conditions of any such transaction (the "Sale Transaction") shall be subject to final documentation between Vintage, CFA (including its affiliates), and the Museum, which shall be based on the term sheet attached hereto as Exhibit A. However, such final documentation shall contain the following terms:<br><br>  1.  CFA, through its affiliates as set forth on Exhibit A, shall retain ownership of 8 aircraft of its choice from the Initial Vintage Aircraft and may sell, keep or donate such aircraft at its sole discretion. These eight aircraft may be on loan to the Museum at no cost until they are removed by the owner. The remaining 16 Initial Vintage Aircraft, and potentially the Additional Vintage Aircraft, shall be purchased and retained by the Museum.<br><br>  2.  The Museum shall enter into a lease agreement whereby the buyer shall lease the Vintage Buildings to the Museum for a term of 20 years following the consummation of the Sale Transaction, in exchange for a total annual lease payment of $600,000.00 ($25,000 per building per month). The Museum will pay all taxes, insurance and all maintenance costs. The Museum shall maintain all facilities at the current level of repair. The parties will agree upon a reasonable maintenance program. At any time the buyer may donate the Vintage Buildings to the Museum as a charitable contribution and thereby terminate the lease, provided the Museum is still a financially viable operation. If the Museum is in default of its rent payments it shall provide the buyer with a lien on the Spruce Goose. Additionally the buyer has a right of first refusal to purchase the Spruce Goose and the Museum has right of first refusal to purchase the Aviation Building and Theater Building. The Museum agrees it will not use the Spruce Goose as collateral for a loan. |
| Distribution of Sale Transaction Proceeds: | Upon entry of the Order, the Purchase Price shall be distributed subject to the priority scheme set forth in title 11 of the United States Code (the "Bankruptcy Code"), except as set forth below. |

2

**Exhibit 1 - Page 2 of 43**
Case 14-36770-rld11   Doc 71   Filed 04/23/15

| | |
|---|---|
| | 1. First, administrative expense claims, priority tax claims, professional fee claims, and non-tax priority claims shall be satisfied in full from the Purchase Price as soon as reasonably practicable after entry of the Order, in an amount not to exceed $1,500,000.00, with the exception that if Vintage receives a tax refund or pays less than $475,000 for pre-petition property taxes for Tax Lot 601, Umpqua shall receive 50% of the tax refund or the amount paid below $475,000 (the "Umpqua Tax Fund Payment"). The $1,500,000 shall include any potential payments to World Fuel with respect to their liens and/or claims on the Dehavilland DH4M.<br><br>2. Second, as soon as reasonable practicable after entry of the Order, but in no event later than five (5) days, Umpqua shall receive cash consideration in a total sum of at least $20,500,000.00 (the "Fixed Umpqua Payment"), potentially the Umpqua Tax Fund Payment, and potentially an additional $500,000 (the "Contingent Umpqua Payment"). Umpqua shall receive the Contingent Umpqua Payment if Vintage is able, using diligent efforts, to avoid certain liens and claims of World Fuel upon the Dehavilland DH4M as preferential or as fraudulent transfers. Umpqua shall receive the Fixed Umpqua Payment, the Umpqua Tax Fund Payment, and the Contingent Umpqua Payment, along with other consideration identified herein, in consideration for its bankruptcy claim against Vintage and such other releases and waivers as are set forth herein. If the Purchase Price is increased for any reason, including overbidding from the Section 363 sale, Umpqua shall receive the same percentage of the increased Purchase Price as it is receiving of the current Purchase Price from the Fixed Umpqua Payment, potential Umpqua Tax Fund Payment, and potential Contingent Umpqua Payment combined, but in no event will Umpqua receive less than the Fixed Umpqua Payment, potential Umpqua Tax Fund Payment and potential Contingent Umpqua Payment. |
| Treatment of Bankruptcy Trustee Claims: | Upon entry of the Order, in full and final satisfaction of any and all claims of the Chapter 7 Debtors and their estates, Holdings will transfer to EIA certain real property (tax lot number R4426-00102) (the "Holdings Land"), as set forth in that certain Settlement Agreement among Holdings, Martin, the Bankruptcy Trustee and others, a copy of which is attached hereto as Exhibit B (the "Martin Agreement"). |
| Treatment of Martin Claims: | Upon entry of the Order, in full and final satisfaction of any and all claims of Martin, Martin shall receive certain consideration as set forth in the Martin Agreement. |

3

**Exhibit 1 - Page 3 of 43**
Case 14-36770-rld11   Doc 71   Filed 04/23/15

| | |
|---|---|
| <u>The Skadden Claims</u> | Upon entry of the Order, the parties hereto will be deemed to have agreed and acknowledged that:

(i) Skadden has a valid, fully perfected, unavoidable claim against the DMS Estate and is seeking $6,587,622.00 against the DMS Estate (the "<u>Skadden Pre-Probate Claim</u>") in the DMS Estate probate action (the "Probate Action").[3]

(ii) The Skadden Pre-Probate Claim is secured by validly perfected and nonavoidable liens upon certain real property pursuant to those Deeds of Trust attached hereto as <u>Schedule 4</u>, and will be paid in order of priority from the sales of certain real property by the DMS Estate and the DMS Trust as identified in the proposed order filed in the Probate Action on March 18, 2015.

(iii) Skadden is entitled to be paid additional appropriate amounts as an administrative creditor of the DMS Estate, until the Estate is settled and fully administered (the "Skadden Probate Claim", and together with the "Skadden Pre-Probate Claim", the "Skadden Claim").

(iii)  Umpqua withdraws its current objection in the Probate Action and its challenge to the Skadden Pre-Probate Claim.

(iv) As part of the Settlement, Vintage will seek an order in Bankruptcy court that the Umpqua liens on the probate and non-probate assets in the Probate Action are fixed in priority vis-à-vis Skadden's liens such that regardless of any court determinations, for amounts up to the Skadden Pre-Probate Claim Skadden shall maintain its priority that currently exists (i.e, if Skadden liens are later invalidated, there is no change in Umpqua recovery in the Probate Action and all funds that would otherwise go to Umpqua shall instead be paid to Skadden until Skadden has received the Skadden Pre-Probate Claim and if the Skadden liens are upheld, then upon satisfaction and indefeasible payment in full of the Skadden Pre-Probate Claim, the Parties agree that Umpqua's lien on the Del Smith Residences (defined below) is superior to Skadden's liens, if any, on the Del Smith Residences). Upon entry of the Order, the Parties agree that (a) Umpqua has a valid, fully perfected, unavoidable claim against Vintage, the DMS Estate, the DMS Trust, VAC and Ventures; (b) this Term Sheet has no effect on Umpqua's lien position on Probate and non-Probate assets of the DMS Estate, the DMS Trust, VAC and Ventures not identified in the proposed order filed in the Probate Action on March 18, 2015, including but not limited to the Del Smith residences (portions of Tax |

---

[3]     The amount of Skadden's claim is greater than the amount it is seeking.

**Exhibit 1 - Page 4 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

| | |
|---|---|
| | Lot R4301-00100 in Yamhill County including 22111 Riverwood Road, Dundee, OR (Residence and 26 acres) and 22800 Fulquartz Landing Road, Dundee, OR (Residence and 20 acres) (collectively, the "Del Smith Residences"); and (c) that this Term Sheet has no effect on the debt obligations that those liens secure as identified in the following: Proof of Claim filed in the Vintage bankruptcy proceeding; General Judgment by Confession against VAC entered on October 29, 2014 in Yamhill County Circuit Court No. 14CV16343; General Judgment by Confession against the DMS Trust et al. entered on October 29, 2014 in Yamhill County Circuit Court No. 14CV16343; and Claim Against Estate dated March 10, 2015 in the Probate Action Circuit Court for the County of Yamhill Court No. 14PB02636 to the extent not satisfied.<br><br>Subject to the foregoing, and upon entry of the Order providing for the relief requested, Skadden shall waive any claims it may have against Vintage. |
| Treatment of MKS Claims: | Upon entry of the Order, MKS will give Museum a 5 years no cost triple net lease on the Water Park. For the avoidance of doubt, the Museum shall remain responsible for payment of all taxes, insurance, utilities, and maintenance costs and obligations in connection with the Water Park. MKS will also give the Museum a right of first refusal on the land it owns. MKS will waive any and all of its claims against Vintage. |
| Subordination of DMS Claims Against Vintage: | Upon entry of the Order, subject to Umpqua and Skadden satisfying all their obligations hereunder, the DMS Estate shall (a) subordinate payment of any and all claims it has (the "DMS Claims") to Umpqua and all other creditors of Vintage, except that the DMS Claims shall not be subordinated to any claims asserted by World Fuel, and (b) expressly confirm herein that this Term Sheet will have no effect upon Umpqua's lien position in the sale of Del Smith Residences and that Umpqua will maintain its lien priority and security interests in all probate and non-probate assets of the DMS Estate and the DMS Trust with the sole exception of the Skadden Pre-Probate Claim. |
| Releases: | Upon entry of the Order, with the exception of Umpqua, each party hereto, on behalf of itself, in all capacities, and its past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, trustees, executors, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with any of the foregoing persons and entities, |

5

**Exhibit 1 - Page 5 of 43**
Case 14-36770-rld11   Doc 71   Filed 04/23/15

and the legal representatives, heirs, successors in interest, and assigns of each of the foregoing persons and entities, absolutely, unconditionally, and irrevocably releases and forever discharges each of the Released Parties (as defined below) of and from the Released Claims (as defined below) that such Party directly, indirectly, or in any other capacity, ever had, now has, or hereafter may have, except as otherwise specifically set forth herein from the beginning of time to the date hereof. Each Party understands and agrees that the releases given pursuant to a final Settlement Agreement shall include any Released Claims that are not known or suspected to exist as of the date thereof and that no fact or circumstance, evidence, or transaction which now could be asserted or which may hereafter be discovered shall affect in any way the final, irrevocable, and unconditional nature of the releases set forth in the final Settlement Agreement. The final Settlement Agreement may be pleaded by any of the Released Parties as a full and complete defense to any proceeding instituted with respect to any Released Claims and may be used as a basis for an injunction against any action, suit, or any proceeding instituted, prosecuted, or attempted with respect to any Released Claims in breach of the provisions of the Settlement Agreement. Notwithstanding the foregoing, Skadden shall not release or waive any of its claims against the DMS Estate, the DMS Trust, Holdings, VAC and Ventures.

Released Parties shall mean the parties listed on Schedule 4 hereto, in all capacities, and each of their respective past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, trustees, executors, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with any of the foregoing persons and entities, and the legal representatives, heirs, successors in interest, and assigns of each of the foregoing persons and entities.

Released Claims shall mean any and all demands, defaults, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all claims, defenses, rights of setoff or recoupment, liabilities, liens, security interests, interests, or rights of any nature whatsoever (including, without limitation, any and all claims for losses, damages (including consequential damages), unjust enrichment, breach of fiduciary duty, breach of contract, attorneys' fees, disgorgement of fees, litigation costs, injunction, declaration, contribution, indemnification or any other type or nature of legal or equitable relief), whether accrued or not, whether already acquired or acquired in the future, whether known or unknown, in law or equity, brought by way of demand, complaint,

answer, defense, cross-claim, claim, third-party claim, or otherwise, arising from, related to, or concerning any contract, connection, or interaction among any of the Parties hereto.

Also upon entry of the Order, Umpqua and each entity or person identified in <u>Schedule 4</u>, on behalf of itself or themselves, in all capacities, and its past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, trustees, executors, and any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with any of the foregoing persons and entities, and the legal representatives, heirs, successors in interest, and assigns of each of the foregoing persons and entities, absolutely, unconditionally, and irrevocably releases and forever discharges each of the Umpqua Released Parties (as defined below) of and from the Umpqua Released Claims (as defined below) that such Party directly, indirectly, or in any other capacity, ever had, now has, or hereafter may have, relating to or arising from Loan nos. 68698484, 68904315, 68698965, 68799801, 68751385, 68760914, and 68830674 except as specifically set forth herein, from the beginning of time to the date hereof. Each Party understands and agrees that the releases given pursuant to a final Settlement Agreement shall include any Umpqua Released Claims that are not known or suspected to exist as of the date thereof and that no fact or circumstance, evidence, or transaction which now could be asserted or which may hereafter be discovered shall affect in any way the final, irrevocable, and unconditional nature of the releases set forth in the final Settlement Agreement. The final Settlement Agreement may be pleaded by any of the Umpqua Released Parties as a full and complete defense to any proceeding instituted with respect to any Umpqua Released Claims and may be used as a basis for an injunction against any action, suit, or any proceeding instituted, prosecuted, or attempted with respect to any Umpqua Released Claims in breach of the provisions of the Settlement Agreement. Notwithstanding the foregoing, for the avoidance of doubt the Parties confirm that Umpqua shall not release or waive any of its claims or liens against the DMS Estate, the DMS Trust, VAC and Ventures and that this Term Sheet shall not have any effect on the debt obligations that those liens secure as identified in the following: General Judgment by Confession against VAC entered on October 29, 2014 in Yamhill County Circuit Court No. 14CV16343; General Judgment by Confession against the DMS Trust et al. entered on October 29, 2014 in Yamhill County Circuit Court No. 14CV16343; and Claim Against Estate dated March 10, 2015 in the Probate Action Circuit Court for the County of Yamhill Court No. 14PB02636 to the extent not satisfied.

<u>Umpqua Released Parties</u> shall mean the parties listed on <u>Schedule 4</u> hereto, in all capacities, and each of their respective past or present affiliates, subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, advisors, insurers, investment advisors, auditors, accountants, representatives, trustees, executors, and

7

**Exhibit 1 - Page 7 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

| | any person, firm, trust, corporation, officer, director, or other individual or entity in which any of them has a controlling interest or which is related to or affiliated with any of the foregoing persons and entities, and the legal representatives, heirs, successors in interest, and assigns of each of the foregoing persons and entities. |
|---|---|
| | <u>Umpqua Released Claims</u> shall mean any and all demands, defaults, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages, and any and all claims, defenses, rights of setoff or recoupment, liabilities, liens, security interests, interests, or rights of any nature whatsoever (including, without limitation, any and all claims for losses, damages (including consequential damages), unjust enrichment, breach of fiduciary duty, breach of contract, attorneys' fees, disgorgement of fees, litigation costs, injunction, declaration, contribution, indemnification or any other type or nature of legal or equitable relief), whether accrued or not, whether already acquired or acquired in the future, whether known or unknown, in law or equity, brought by way of demand, complaint, answer, defense, cross-claim, claim, third-party claim, or otherwise, relating to or arising from Loan nos. 68698484, 68904315, 68698965, 68799801, 68751385, 68760914, and 68830674; with the express exception that, for the avoidance of doubt the Parties confirm that Umpqua shall not release or waive any of its claims or liens against the DMS Estate, the DMS Trust, VAC and Ventures and that this Term Sheet shall not have any effect on the debt obligations that those liens secure as identified in the following: General Judgment by Confession against VAC entered on October 29, 2014 in Yamhill County Circuit Court No. 14CV16343; General Judgment by Confession against the DMS Trust et al. entered on October 29, 2014 in Yamhill County Circuit Court No. 14CV16343; and Claim Against Estate dated March 10, 2015 in the Probate Action Circuit Court for the County of Yamhill Court No. 14PB02636 to the extent not satisfied. |
| <u>Waiver under California Civil Code § 1542</u>: | Upon entry of the Order, within the scope of each Party's releases under the Settlement Agreement, such releases constitute waivers by such Party of any and all rights under section 1542 of the Civil Code of California (or any similar, comparable, or equivalent law of any state or territory of the United States, or principle of common law), which provides as follows:<br><br>A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST |

8

**Exhibit 1 - Page 8 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

| | |
|---|---|
| | HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR. |
| <u>Dismissal and/or Withdrawal of Objections, Actions, and Proceedings; Affirmative Actions by Umpqua:</u> | Upon entry of the Order, with the exception of Umpqua, each Party hereto shall immediately dismiss or withdraw with prejudice any and all actions or proceedings (including contested matters, motions, objections, or other pleadings) commenced by such Party against each other. Each Party shall otherwise take any and all such action as may be reasonably requested to effect the releases provided by the Settlement Agreement, including, but not limited to, releasing any liens upon real or personal property owned by any Released Party hereto except as specifically provided herein or in the attachments hereto. |
| | Without in any way limiting the foregoing, Umpqua shall take the following actions: |
| | • Upon entry of the Order, (a) Umpqua shall immediately withdraw any and all objections to the motion to approve the proposed sale of certain real property pursuant to that certain Purchase and Sale Agreement attached hereto as <u>Exhibit C</u>, pending in the probate court of Yamhill County, Oregon, and shall affirmatively support the relief sought therein; (b) in connection with this sale, Umpqua shall maintain its lien priority with the exception of the Skadden Pre-probate Claim; (c) Umpqua's liens and interests upon the real property identified in <u>Exhibit C</u> hereto, regardless of the identity of the owner of such property, shall be transferred to the proceeds from the sale maintaining Umpqua's lien priority with the exception of the Skadden Pre-probate Claim and simultaneously Umpqua's liens and interest upon the real property identified in Schedule 3 hereto, regardless of the identity of the owner of such property, shall be released; (d) Umpqua affirmatively agrees to distribution of the proceeds of such proposed sale pursuant to any order entered by the Circuit Court of the State of Oregon for the County of Yamhill, Probate Department, subject to compliance with applicable law and additional applicable terms specified in this Term Sheet; and (e) Umpqua shall not object to any future proposed sales of real or personal property belonging to the DMS Estate or the DMS Trust, provided that proceeds from such sales are distributed pursuant to applicable law, the sale is for fair market value, and with the express agreement that nothing in this Term Sheet has any effect on Umpqua's lien position in the sale of the Del Smith Residences, subject to subsection (iv) of the "Skadden Claims" section above. |
| | • Upon entry of the Order, Umpqua shall maintain any and all other claims and liens it has or may have against the DMS Estate and the |

9

**Exhibit 1 - Page 9 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

| | |
|---|---|
| | DMS Trust, including, but not limited to, any guaranty claims.<br><br>• Upon execution of this Term Sheet, Umpqua's motion for relief from the stay in the Vintage bankruptcy shall be continued to the first half of June 2015. |
| Specific Performance: | Upon entry of the Order, the Parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event any provision of the Settlement Agreement was not performed in accordance with the terms thereof and the Parties accordingly agree that, in addition to any other remedy at law or in equity, the Parties shall each be entitled to seek an injunction, specific performance or other equitable relief in connection with preventing breaches or enforcing the terms of the Settlement Agreement. |
| Dispute Resolution | The parties agree that any disputes regarding the enforcement or interpretation of this Term Sheet shall be resolved in binding arbitration by the mediator, The Honorable Elizabeth L. Perris, in the Bankruptcy Court, which will have ongoing jurisdiction and that the prevailing party in any such action is entitled to recover its costs and reasonable attorneys' fees. |
| Assistance | Upon the entry of the Order, Ventures will assist in the sale of Tax Lot No. R4426-00600 including the land and the Eagle Building, and the Bankruptcy Trustee will acknowledge an acceptable easement arrangement.<br><br>Upon entry of the Order, VAC will assist in the sale of the August Westland AW 139 Helicopter N140EV. |
| Conditions Precedent | 1. CFA providing proof of funds within 10 days upon the signing this Term Sheet is a condition precedent.<br><br>2. Ventures not declaring bankruptcy is a condition precedent.<br><br>3. VAC not declaring bankruptcy is a condition precedent.<br><br>4. Umpqua will continue to honor its contractual obligation to support the sale of certain vintage aircraft to Erickson Aviation, LLC, but it will not contest the Order. |

*Remainder of page intentionally blank*

10

**Exhibit 1 - Page 10 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

**Accepted and agreed to as of the date first written above (facsimile or scanned signatures being valid as if an original) by the following:**

**Evergreen Vintage Aircraft, Inc.**       **Evergreen Holdings, Inc.**

_____
Lisa Anderson, President

_____
Lisa Anderson, President

**The Estate of Delford M. Smith**     **The Michael King Smith Foundation**

_____
Jay Goffman, Personal Representative

_____
Jay Goffman, Trustee

_____
James Ray, Personal Representative

_____
James Ray, Trustee

_____
Lisa Anderson, Personal Representative

_____
Lisa Anderson, Trustee

**Delford M. Smith Revocable Trust**     **Ventures Acquisition Company, LLC**

_____
Jay Goffman, Trustee

_____

_____
James Ray, Trustee

_____
Lisa Anderson, Trustee

**Ventures Holdings, Inc.**     **Evergreen Aviation and Space Museum and Captain Michael King Smith Education Institute**

_____

_____

Signature Page to Global Settlement Term Sheet

**Exhibit 1 - Page 11 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

**Umpqua Bank**

_____

**Alfred T. Giuliano, as Chapter 7 Trustee for:**
**Evergreen International Aviation, Inc.;**
**Evergreen Aviation Ground Logistics Enterprise, Inc.;**
**Evergreen Defense & Security Services, Inc.;**
**Evergreen International Airlines, Inc.;**
**Evergreen Systems Logistics, Inc.;**
**Evergreen Trade, Inc.;**
**Supertanker Services, Inc.**

_____

**CFA**

_____

**Skadden, Arps, Slate, Meagher & Flom LLP**

_____

**Andrew Martin**

_____

Signature Page to Global Settlement Term Sheet

**Exhibit 1 - Page 12 of 43**
Case 14-36770-rld11   Doc 71   Filed 04/23/15

**EXHIBIT A**

**SALE TERM SHEET**

**Exhibit 1 - Page 13 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

# EXHIBIT A TO GLOBAL SETTLEMENT TERM SHEET

**Agreement With Select Parties In Evergreen Vintage Aircraft, Inc. Bankruptcy**

## RECITALS

A. The Parties to this Agreement are Evergreen Vintage Aircraft, Inc. (Vintage), Evergreen Aviation and Space Museum and the Michael King Smith Educational Institute (Museum), and CF & Associates and its nominees (CFA).

B. The terms herein reflect the agreement of the Parties subject to approval by all appropriate authorities, including the Museum Board of Directors. This Agreement represents a statement of the principal terms subject to final agreements, which will contain additional terms consistent with the terms herein.

## TERMS

1. The Vintage bankruptcy will be resolved through a Plan of Liquidation, which will be confirmed by an Order of the Bankruptcy Court for the District of Oregon. The general terms of this settlement and sale will be disclosed to all parties and approved by the Court, as described below.

2. CFA will provide $22 million into the Vintage bankruptcy at closing. As consideration for the $22 million, CFA shall receive the properties stated below on the terms stated below, free and clear of the liens and encumbrances. However, CFA agree that the Douglas A-26C "Invader" (but not the de Havilland DH-4M-1) shall be turned over to World Fuels to the extent that the Court finds that World Fuels had a valid and unavoidable lien on the Invader.

3. At closing, CFA will receive title, and a signed FAA bill of sale, with no liens or encumbrances to twenty-five (25) Vintage-owned aircraft. However, CFA agrees that the Douglas A-26C "Invader" shall be turned over to World Fuels to the extent the Court finds that World Fuels had a valid and unavoidable lien on the Invader. The aircraft transferred to CFA shall be in "As Is" condition.

4. At closing, CFA acquires all Vintage-owned assets, which are the Aviation Building, the Theatre Building, the underlying 30 acres of land, property, plant and equipment, displays, artifacts, etc. All such Vintage-owned assets shall be transferred to CFA free and clear of all liens and encumbrances

5. CFA may keep, sell, or donate eight aircraft as it chooses. These eight aircraft may remain on loan to the Museum for some time period at no cost to the Museum for as long as such aircraft remain on loan. All disassembly and move costs incurred in removing the aircraft from the Museum shall be incurred by CFA and CFA shall provide reasonable advance written notice to the Museum of its intent to remove aircraft.

6. The CFA Aircraft may remain on loan to the Museum, at no cost to the Museum. At a latter date CFA may donate these aircraft to the Museum provided they are a financially viable organization.

7. CFA will lease the Property – the Aviation Building, the Theatre Building, and all the related land (Tax Lot 601) - to the Museum for $25,000 per month per building ($50,000 per month total; $600,000 a year total) on a 20-year lease.

8. The leases on the Property will be Triple-Net: The Museum shall continue to pay all taxes, insurance, utilities, and maintenance costs as it does at present.

**1 - EXHIBIT A: SALES TERMS**

**Exhibit 1 - Page 14 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

9. The Property leases (one for each building) between CFA and the Museum will include provisions regarding a building maintenance program, as defined in the leases, to maintain all facilities used by the Museum at the current level of repair and with objective standards in place.

10. The Museum will have (a) the Right of First Refusal as to any sale of the Aviation Building, the Theater Building and Tax Lot 601 or parts thereof (Property) during the terms of the leases, and (b) an Option to Purchase the Property in its entirety, at fair market value ("FMV") during the lease terms. The terms of which will be defined in the lease agreements. CFA states that they may donate the Aviation & Theater Buildings and Tax Lot 601 to the Museum provided the Museum is financially viable and the donation fits with the donors tax planning.

11. CFA will have, under the Property leases, a right to place a lien on the Spruce Goose if the Museum is in default on its lease payments and has not cured such default by the time the 30 day cure period for default has expired.

12. CFA will have, under the Property leases, a Right of First Refusal as to any sale of the Spruce Goose by the Museum.

13. CFA will have no role in, or control over, the Museum, its Board, the Museum's governance and/or operations.

14. Upon closing, CFA will receive one lifetime pass to the Museum, to include access to all buildings operated by the Museum and all events held and/or sponsored by the Museum on the Museum campus.

16. Most if not all of the agreements in which the Museum is a party relating to the terms stated above can be incorporated into the following documents:

   a. Leases between CFA and the Museum as to Tax Lot 601 (Aviation and Theatre buildings and the land).

   b. A loan and display agreement between CFA and the Museum as to the display of the remaining aircraft.

   c. A loan and display agreement between CFA and the Museum on the eight former Vintage aircraft to be designated, until such time as they may be removed.

   d. Non-Disclosure Agreement.

17. This Agreement must be finalized and approved by the Museum's Board of Directors and all parties to these agreements by April 27, 2015. An authorized representative of the Museum must approve, in writing, any changes to this Agreement before such changes have effect.

18. All contingencies stated in this Agreement must be satisfied for the Parties to remain bound by this Agreement.

19. This Agreement is subject to and does not become effective until approval by all appropriate authorities, including the Museum Board of Directors. This Agreement represents a statement of the principal terms subject to final agreements, which will contain additional terms consistent with the terms herein.

20. For the Museum to be financially viable means it can have no liens or encumbrances on the Spruce Goose (aside of CFA) and be cash flow positive for 3 consecutive years.

**2  -  EXHIBIT A: SALES TERMS**

**Exhibit 1 - Page 15 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

# EXHIBIT A TO GLOBAL SETTLEMENT TERM SHEET

This Agreement may be executed and transmitted via email or facsimile, and shall, when so executed and transmitted, be valid as though an original.

**Evergreen Vintage Aircraft, Inc.**

_____     Dated this _____ day of April, 2015.
Lisa Anderson, President


**CF & Associates**

_____     Dated this _____ day of April, 2015.
Rob Collings, President


**The Evergreen Aviation and Space Museum and the Captain Michael King Smith Educational Institute**

_____     Dated this _____ day of April, 2015.


**3  -  EXHIBIT A: SALES TERMS**

**Exhibit 1 - Page 16 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

**EXHIBIT B**

**MARTIN AGREEMENT**

**Exhibit 1 - Page 17 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

# SETTLEMENT AGREEMENT

This Settlement Agreement (this "Agreement") is made and entered into as of April ___, 2015, by, between and among Alfred T. Giuliano, chapter 7 trustee (the "Trustee") on behalf of the estates of Evergreen International Aviation, Inc., *et al.* (the "Debtors")[1], Andrew M. Martin ("Martin"), Greyson Financial Services, Inc. ("Greyson") (Martin and Greyson are collectively referred to herein as the "Martin Parties"), (c) Evergreen Holdings, Inc. ("Holdings"), and (d) Jay M. Goffman, in his capacity as executor of the estate of Delford T. Smith ("Smith"). Any reference herein to the "Parties" shall refer collectively to the Trustee, Debtors, Martin Parties, Holdings, World Fuel, and Smith.

## RECITALS

WHEREAS, the Debtors each commenced chapter 7 cases (the "Bankruptcy Cases") under title 11 of the United States Code (the "Bankruptcy Code") that are presently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

WHEREAS, the Trustee was appointed as the chapter 7 trustee for the estates of each of the Debtors.

WHEREAS, Holdings is the disputed owner of the land and building known as 3800 NE Three Mile Lane, McMinnville, Oregon 97128 (the "3800 Property").

WHEREAS, Martin holds a purported secured lien against the 3800 Property in the principal amount of $4,200,000 (the "Martin Lien").

WHEREAS, Smith is the owner of certain parcels of agricultural real estate more particularly described on Exhibits A and B (the "Farms") that are currently subject to a purchase agreement with an expected net sale price of approximately $1,900,000. Martin also purports to hold secured liens against the Farms and expects to recover $1,600,000 of his loan from this sale.

WHEREAS, there are disputes amongst the Parties as to various claims against each other, and, in particular, the Trustee has asserted various claims against the Martin Parties, Holdings, and other entities not named in this Agreement.

WHEREAS, the Parties, among others, participated in a mediation before the Honorable Elizabeth L. Perris on March 26 and 27, 2015, which mediation resulted in the Parties agreeing to resolve certain of their disputes on the terms and conditions set forth herein.

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Evergreen International Aviation, Inc. (9079); Evergreen Aviation Ground Logistics Enterprise, Inc. (6736); Evergreen Defense & Security Services, Inc. (0118); Evergreen International Airlines, Inc. (7870); Evergreen Systems Logistics, Inc. (0610); Evergreen Trade, Inc. (0952); and Supertanker Services, Inc. (3389). The Debtors' address is 3850 Three Mile Lane, McMinnville, Oregon 97128.

**Exhibit 1 - Page 18 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

# AGREEMENT

NOW, THEREFORE, after good faith, arms' length negotiations without collusion, and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to the following terms:

1.      <u>Recitals</u>.  Each of the recitals set forth above are hereby incorporated herein, and the Parties acknowledge that each recital is true and correct.

2.      <u>Effective Date</u>.  The term "<u>Effective Date</u>" shall mean the first date by which each of the following conditions has occurred:  (a) this Agreement is executed by each of the Parties; (b) the Bankruptcy Court enters an order approving this Agreement in a form acceptable to the Parties, provided that such order has not been stayed; and (c) each and all of the conditions precedent have occurred in its and their entirety.  Promptly after this Agreement is signed by each of the Parties, the Trustee shall file a motion or motions with the Bankruptcy Court requesting approval of this Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

3.      <u>Transfer of 3800 Building and Related Real Property</u>.  Holdings shall transfer to Evergreen International Aviation, Inc. ("Aviation") the 3800 Property free and clear of any claims, interests, liens, and encumbrances except the Martin Lien.

4.      <u>Sale of 3800 Property and Distribution of Proceeds</u>.  The 3800 Property shall be sold by the Trustee and upon closing Martin shall release the Martin Lien.  If the Net Sale Price (defined below) of the 3800 Property is $6,500,000 or less, Martin shall receive $2,000,000 from the Net Sale Price.  If the Net Sale Price of the 3800 Property is greater than $6.5 million, but less than $7,000,000, Martin shall receive $2.5 million from the Net Sale Price.  If the Net Sale Price is greater than $7,000,000, Martin shall receive the sum of $2,500,000 plus 20% of each dollar above $7,000,000.  The term net sale price ("<u>Net Sale Price</u>") as used herein shall mean the gross sale price less the costs of sale (e.g., commissions, real estate taxes, professionals fees related solely to the sale of the 3800 Property, title fees, transfer taxes, escrow charges, and other normal and customary transaction costs).

5.      <u>Allocation of 3800 Property Proceeds</u>.  In the event that the Trustee is authorized to sell the 3800 Property in a combination with other properties then the Trustee and Martin will work together in good faith to an allocation of the purchase price so that the allocation to the 3800 Property reflects fair market value.

6.      <u>Conditions Precedent</u>.  The conditions precedent to effectiveness of this Term Sheet shall be as follows: (a) World Fuel shall release all interest and claims against the 3800 Property and the Debtors' estates; (b) Holdings shall transfer its interests in the 3800 Property to Aviation free and clear of all liens, claims and encumbrances (other than customary easements, such as for utilities) and the Martin Lien; (c) the net proceeds of the sale of the Farms, after paying any lien senior to Martin, shall be paid to Martin; and (d) the United States Bankruptcy Court for the District of Oregon approves a global settlement involving Umpqua Bank and World Fuel, which settlement shall not be inconsistent with the terms of this Agreement and provides, among other things, that World Fuel shall release any liens, claims or interest it may

- 2 -

have in the 3800 Property and the Farms, and that Chemoil Corporation releases its claims against the Farms.

7.     <u>Evergreen Vintage Aircraft Proof of Claim.</u> Promptly upon the satisfaction of all of the Conditions Precedent, the Trustee shall withdraw any and all proofs of claims he filed or caused to have filed in Evergreen Vintage Aircraft, Inc.'s chapter 11 bankruptcy proceeding.

8.     <u>Releases.</u>

    a.     Except for the obligations under this Agreement and upon the occurrence of all of the conditions precedent in their entirety, the Trustee shall, without further action, irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge the Martin Parties, Holdings, World Fuel Services, Inc., Evergreen Vintage Aircraft, Inc., the Michael King Smith Foundation, Delford Smith and his decedent's estate, and each of their respective, to the extent applicable, officers, directors, managers, executors, employees, attorneys, accountants, financial advisors, and each of their respective successors and assigns (collectively, the "<u>Martin/Holdings Releasees</u>") of and from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Trustee had, has or may have or may claim to have against any of the Martin/Holdings Releasees.

    b.     Except for the obligations under this Agreement and upon the occurrence of all of the conditions precedent in their entirety, each of the Martin/Holdings Releasees shall, without further action, irrevocably and unconditionally, fully, finally and forever waive, release, acquit and discharge the Trustee, the Debtors, the Debtors' estates, and each of their employees, attorneys, accountants, financial advisors, subsidiaries, and each of their successors and assigns (collectively, the "<u>Trustee/Debtor Releasees</u>") of and from any and all claims, manner of actions, causes of action, suits, costs, debts, liabilities, obligations, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, executions and demands whatsoever, of whatever kind or nature, whether known or unknown, suspected or unsuspected, in law or equity, which the Trustee had, has or may have or may claim to have against any of the Trustee/Debtor Releasees.

9.     <u>Party Representations.</u> Each Party hereby represents and warrants that: (a) such Party and the signatory hereto has the power and authority to execute, deliver and perform this Agreement; (b) such Party has taken all necessary actions to authorize the execution, delivery and performance of this Agreement; (c) this Agreement has been duly executed and delivered by such Party and constitutes the legal, valid, and binding obligations of such Party (subject to applicable Court approval, if necessary), enforceable against it in accordance with their respective terms; (d) such Party's execution, delivery, and performance of this Agreement does not and will not conflict with, or constitute a violation or breach of, or constitute a default under any obligation of such Party and will not violate any applicable law, or any order or decree of any court or government instrumentality applicable to such Party; and (e)

- 3 -

such Party has entered into this Agreement in reliance on its own independent investigation and analysis of the facts underlying the subject matter of this Agreement, and no representations, warranties, or promises of any kind have been made directly or indirectly to induce it to execute this Agreement other than those that are expressly set forth in this Agreement.

10. <u>Continuing Bankruptcy Court Jurisdiction</u>. Each Party agrees that, with respect to disputes involving the Trustee and the Debtors, the Bankruptcy Court shall have exclusive jurisdiction over any disputes regarding the validity, interpretation, or performance of this Agreement so long as the Bankruptcy Cases are pending, and each of the Parties consents to personal jurisdiction and venue in the Bankruptcy Court in connection with any such disputes; <u>provided</u>, <u>however</u>, that if the Bankruptcy Cases are no longer pending, or if the Bankruptcy Court cannot or does not exercise jurisdiction, such jurisdiction and venue shall belong to the federal courts in the District of Delaware.

11. <u>Specific Performance; Damages</u>. The exact nature and extent of damages resulting from a breach of this Agreement are uncertain at the time of entering into this Agreement and breach of this Agreement would result in damages that would be difficult to determine with certainty. Money damages would not be a sufficient remedy for any breach of this Agreement, and the Parties shall each be entitled to specific performance and injunctive or other equitable relief as a remedy of any such breach. Notwithstanding anything to the contrary set forth above, the remedy of specific performance shall not be the exclusive remedy of the Parties under this Agreement in the event of a breach of this Agreement by another Party hereto.

12. <u>Voluntary Agreement</u>. Each Party acknowledges that it has read all of the terms of this Agreement, has had an opportunity to consult with counsel of its own choosing or voluntarily waived such right and enters into this Agreement voluntarily and without duress.

13. <u>Further Assurances</u>. Each Party agrees, without further consideration, to execute and deliver such other documents and to take such other action as may be necessary to consummate the purposes of this Agreement.

14. <u>No Admission</u>. This Agreement is for settlement purposes only and shall not be construed or deemed an admission by any Party to this Agreement of wrongdoing, liability, fault, or the validity of any claims.

15. <u>Valid Provisions Remain Effective</u>. If any provision in this Agreement shall be invalid, inoperative or unenforceable, the remaining provisions of this Agreement shall remain in effect if both the economic and legal substance of the terms contemplated hereby are not materially affected in any manner adverse to any Party. Otherwise, the Parties shall negotiate in good faith to rewrite any such provision so as to, as nearly and fairly as possible, approach the economic and legal substance originally intended.

16. <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against either Party. Nor will any rule of construction that favors a non-draftsman be applied. A reference to any statute will be deemed also to refer to all rules and regulations promulgated under the statute, unless the context requires otherwise. Unless

- 4 -

**Exhibit 1 - Page 21 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

specifically otherwise provided or the context otherwise requires, the singular includes the plural and the plural the singular; the word "or" is deemed to include "and/or", the words "including", "includes" and "include" are deemed to be followed by the words "without limitation", and references to sections are to those of this Agreement. Headings in this Agreement are included for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

17.      Advice of Counsel.  Each Party represents that it has had the opportunity to obtain advice of counsel in connection with this Agreement and all matters covered hereby, and that each Party has been fully advised by those attorneys with respect to its rights and obligations under this Agreement.

18.      Counterparts.      This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same Agreement.  Delivery of a signature page to this Agreement by facsimile or other electronic means shall be effective as delivery of the original signature page to this Agreement.

19.      Joint Drafting.  This Agreement shall be deemed to have been jointly drafted by the Parties, and in construing and interpreting this Agreement, no provision shall be construed and interpreted for or against any Party because such provision or any other provision of the Agreement as a whole is purportedly prepared or requested by such Party.

20.      Applicable Law.      The validity, interpretation, and performance of this Agreement shall be construed and interpreted according to the laws of the State of Delaware, except to the extent that (a) provisions of the Bankruptcy Code apply, in which event the Bankruptcy Code shall control, or (b) applicable federal law preempts state law.

21.      Attorneys' Fees, Costs and Expenses.  Each Party agrees to bear its own costs and expenses, including attorneys' fees, arising out of the matters addressed by this Agreement.

22.      Entire Agreement.  This document contains the entire Agreement between the Parties as to the matters addressed herein, and may only be modified in writing signed by the Parties or their duly appointed agents.  All prior agreements and understandings between the Parties concerning the subject matter hereof are superseded by the terms of this Agreement.

23.      Successors and Assigns.  This Agreement shall be binding on and inure to the benefit of the Parties and their respective agents, employees, affiliates, successors, and, with the consent of all Parties, assigns.

24.      Notices.  All notices, consents, waivers, and other communications under this Agreement must be in writing and shall be deemed to have been duly given when:  (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), or (c) received by the addressee, if sent by email, in each case to the appropriate addresses, representative (if applicable) and telecopier numbers set forth in the signature page(s) attached hereto (or to such other addresses, representative and telecopier numbers as a Party may designate by notice to the other Parties in accordance with this paragraph).

- 5 -

**Exhibit 1 - Page 22 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

**Exhibit 1 - Page 23 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date written in the opening paragraph hereof.

**Alfred T. Giuliano,**
**solely in his capacity as chapter 7 trustee of**
**Evergreen International Aviation, Inc.** *et al.*
**and not in any individual capacity**

**Andrew M. Martin**

_____
Alfred T. Giuliano, Trustee
Berlin Business Park
140 Bradford Drive
Berlin, NJ 08091

_____
Andrew M. Martin
5905 SE Columbia Way, Unit 302
Vancouver, WA 98661

**Evergreen Holdings, Inc.**

**Greyson Financial Services, Inc.**

_____
Name:
Title:
3850 Three Mile Ln
McMinnville, OR 97128

_____
Andrew M. Martin
Title:
440 1st Ave E #3
Albany, OR 97321

**Jay M. Goffman, Esquire, solely in his**
**capacity as the executor of the estate of**
**Delford T. Smith, and not in any**
**individual capacity**

_____
Jay M. Goffman, Esquire
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York NY 10036

- 7 -

**Exhibit 1 - Page 24 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

**EXHIBIT C**

**PURCHASE AND SALE AGREEMENT**

TO BE FILED UNDER SEAL

**Exhibit 1 - Page 25 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

## SCHEDULE 1

## INITIAL VINTAGE AIRCRAFT

- 1945 Boeing B-17G (Flying Fortress)
- Lockheed P-38 L-5
- Messerschmitt BF-109G-10/U4
- North American T-28B Trojan
- Pitts Aerobatics S-2B
- Vickers Supermarine Spitfire Mark XVI
- Piper J3L-65 "Cub"
- North American SNJ-4
- Boeing E75 Stearman
- Curtiss Wright "Air Sedan"
- Hughes 269A
- Curtis Jenny (Replica)
- Hiller UH-12E
- Curtis P40 Kittyhawk "Warhawk"
- Curtis Wright A-22 Falcon
- Dehavilland DH4M
- 1903 Wright Flyer (Replica)
- Photo Space Capsule
- Bell HTL-3
- Bell OH-13 Sioux
- Hiller H-23, 12-B
- Sikorsky H19
- Sikorsky HO35-1G "Dragonfly"
- Mikoyan-guryevich MiG-15UTI

**Exhibit 1 - Page 26 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

## SCHEDULE 2

## ADDITIONAL VINTAGE AIRCRAFT

- Douglas A-26B Invader

**Exhibit 1 - Page 27 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

## SCHEDULE 3

## SKADDEN DEEDS OF TRUST

**Exhibit 1 - Page 28 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

RECORDING REQUESTED BY:
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036-6522
AFTER RECORDING RETURN TO:
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036-6522

Escrow No: 471813029171-TTMIDWIL36



OFFICIAL YAMHILL COUNTY RECORDS
BRIAN VAN BERGEN, COUNTY CLERK

201317339

$76.00

0042771920130017339009009090

11/13/2013 02:52:03 PM

DMR-DTDMR   Cnt=1 Stn=3 SUTTONS
$45.00 $5.00 $11.00 $15.00

## TRUST DEED

THIS TRUST DEED, made on the __13__ day of November, 2013, between Delford M. Smith, Trustee of the Delford M. Smith Revocable Trust created under restated trust agreement dated February 29, 1996, as Grantor, Ticor Title Company, as Trustee and Skadden, Arps, Slate, Meagher & Flom, LLP, as Beneficiary,

WITNESSETH:

Grantor irrevocably grants, bargains, sells and conveys to trustee in trust, with power of sale, the property in , , described as:

PARCEL 1:

Beginning at the Southwest corner of that tract of land particularly described in that certain deed from Frank
R. Gibbon to Ben H. Asquith, et al, recorded in Volume 153, Page 656, Deed Records, Yamhill County, Oregon; thence North 15° East 711 feet to the true point of beginning; thence South 75° East 1877.75 feet; thence South 14° West 742.1 feet; thence North 74° 30' West 1411.64 feet; thence North 15° East 466.62 feet; thence North 74°04' West 466.62 feet; thence North 15° East 244.38 feet to the point of beginning.

PARCEL 2:

A tract of land in Sections 1 and 12, Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, more particularly described as follows:

Part of that tract of land conveyed to Ben Asquith, et al by deed recorded in Book 153, Page 656, Yamhill County Deed Records, being further described as follows:

Beginning on the South line of said conveyance to Asquith, at a point South 00°14' West 423.4 feet and South 74°30' East 4772.0 feet from the Northwest corner of the Medorem Crawford Donation Land Claim in Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon; thence South 74°30' East, along the South line of said conveyance to Asquith, 1228.5 feet to the bank of the Willamette River; thence North 06°26' West 815.76 feet to a point on the bank of the River and on the Northerly line of said conveyance to Asquith; thence North 75°26' West 936.15 feet to a point on the Northerly line; thence South 14°34' West 742.1 feet to the point of beginning.

PARCEL 3:

Beginning at the Southwest corner of that certain tract of land particularly described in that certain Deed from Frank R, Gibbon to Ben H. Asquith, et ux, and Ben H. Asquith, Jr., et ux, recorded in Volume 153, page 656, Deed Records, Yamhill County, Oregon; thence North 15° East 7.07 chains; thence South 74°04' East 7.07 chains; thence South 15°West 7.07 chains; thence North 74°04' West 7.07 chains to the point of beginning.

PARCEL 4:

That part of the following described property lying South of the Yamhill County Road No. 79:

A part of the Donation Land Claim of Seward Fulquarts and Adeline Fulquarts, his wife, Notification No. 1044, Claim Nos. 72 and 70, Township 3 South, Range 3 West and Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, more particularly described as follows:

Beginning at a point 14.06 chains East of the Northwest corner of said Donation Land Claim; thence East 6.73 chains; thence South 44.30 chains to the division line between the North and South halves of said Donation Land Claim; thence West 20.88 chains to the West boundary line

**Exhibit 1 - Page 29 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

of said Donation Land Claim; thence North, on said West boundary line, 15.85 chains to the Southwest corner of the tract of land conveyed to D.C. Neal by Deed recorded at Page 164 of Volume "N", Deed Records of Yamhill County, Oregon; thence East 14.15 chains to the Southeast corner of the said Neal tract of land; thence North, on the East line of said Neal tract, of land, 28.45 chains to the place of beginning.

EXCEPTING that tract of land consisting of .98 of an acre, more or less, conveyed to J.D. and N.E. Gordon by deed from B.C. Leland and wife, on December 18, 1905, which said Deed is recorded in Book 48, Page 355, Deed Records of Yamhill County, Oregon.

EXCEPTING any portion contained in the following description:

Part of the Seward Fulquarts and Flores Fulquarts Donation Land Claim in Sections 1 and 2 and all of Government Lots 4 and 5 in Section 2, all in Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, more particularly described as follows:

Beginning at an iron rod North 89°05' West 136.62 feet from the Northwest corner of Section 1, Township 4 South, Range 3 West of the Willamette Meridian; thence South 89°05' East 811.81 feet, more or less, to an iron pipe on the East line of the former railroad right of way; thence South 01°20' West 346.50 feet to an iron pipe set North 01°20' East 20.5 feet from the center line of the County Road; thence South 89°05' East 1834.00 feet, more or less, to the Willamette River; thence, following the meanderings of said river upstream, to an iron pipe at the Southeast corner of said Seward Fulquarts Donation Land Claim; thence North 74°25'45" West, along the South line of said Fulquarts Donation Land Claim, 4561.07 feet, more or less, to an iron pipe at the Southwest corner of said Seward F. Fulquarts Donation Land Claim; thence North 85°08'30" West 1110.51 feet, more or less, to a granite stone set at the most Easterly Southeast corner of the Government resettlement survey of Unit 16; thence North 01°48'40" East 849.20 feet to an iron pipe on the South line of the Flores Fulquarts Donation Land Claim; thence South 89°57' West 224.16 feet to an iron pipe in the County Road, which iron pipe is 14 feet East of the Center line thereof; thence North 02°21' East 1320.00 feet to an iron pipe; thence North 89°42' East 1320.00 feet to an iron pipe on the West line of the Seward Fulquarts Donation Land Claim; thence North 01°48'40" East 792 feet to an iron pipe at the division corner between the North half and the South half of said Seward Fulquarts Donation Land Claim, as per Survey No. 923; thence South 86°13'45" East, along said division line, 1128.60 feet to an iron pipe; thence North 38°48'15" East 423.13 feet to an iron pipe; thence North 03°01'30" East 775.50 feet to the place of beginning.

PARCEL 5:

Lots 8, 8, 9, 10, 11 and 12 of ROSSNER'S SUBDIVISION of a part of the Donation Land Claim of Flores Fulquarts in Townships 3 and 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon.

ALSO:

Beginning at the Southeast corner of Lot 14 of ROSSNER'S SUBDIVISION of a part of the Donation Land Claim of Flores Fulquarts in Townships 3 and 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon; thence North 00°27' East, along the East line of said lot, 10.11 chains to the South line of said Lot 11 of said Subdivision; thence South 88°14' West, along the South line of Lots 11 and 12, 19.83 chains to a stake on the East line of the County Road; thence South, along the East line of the County Road, 10.11 chains to an anchor post on the South line of Lot 13; thence North 88°14' East, along the South line of Lots 13 and 14, 19.75 chains to the point of beginning.

PARCEL 6:

A part of the tract of land situated in Sections 2 and 11, Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, in the John A. Wren Donation Land Claim, Notification No. 2488, conveyed to the United States of America, by Frank and Minnie Gibbon, by Deed recorded March 3, 1937, in Book 112, Page 267, Deed Records of Yamhill County, Oregon, said part being more particularly described as follows:

Beginning at the Northeast corner of the John A. Wren Donation Land Claim, being marked by a stone; thence South 88°49'43" West, along the North line of the John A. Wren Donation Land Claim, for a distance of 1565.70 feet to the Southwest corner of the Flores Fulquarts Donation Land Claim, said corner being marked by a stone; thence North 02°26'17" East, along the West line of the Flores Fulquarts Donation Land Claim, for a distance of 537.29 feet to the Southeast corner of the E.R. Geary Donation Land Claim, said corner being marked by a stone; thence North 89°02'29" West, along the South line of the E.R. Geary Donation Land Claim, for a distance of 302.45 feet to a point marked by a 1-1/2 inch iron pipe; thence South 00°26'23" West for a distance of 2885.77 feet to a point on the center line of the County Road marked by a 3/4 inch iron pipe; thence South 80°30'22" East, along the center line of the County Road, for a distance of 312.22 feet to a point; thence North 81°35'33" East, along the center line of the County Road,

**Exhibit 1 - Page 30 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

for a distance of 390.12 feet to a point; thence South 89°11'04" East, along the center line of the County Road, for a distance of 290.19 feet to a point; thence North 88°58'00" East, along the center line of the County Road, for distance of 648.63 feet to a point on the West line of the Medorem Crawford Donation Land Claim, said point being marked by a 3/4 inch iron pipe; thence North 00°30'41" East, along the said West line, a distance of 1515.24 feet to the Northwest corner of the Medorem Crawford Donation Land Claim, said corner being marked by a 3/4 inch iron pipe; thence South 89°33'48" East, along the North line of the Medorem Crawford Donation Land Claim, for a distance of 214.50 feet to a point marked by a stone on the East line of the John A. Wren Donation Land Claim; thence North 00°26'12" East, along the East line of the John A. Wren Donation Land Claim, for a distance of 849.20 feet, more or less, to the place of beginning.

PARCEL 7:

Beginning at an iron pipe which is set in the center of the County Road and is South 00°29' West 155.1 feet from the corner of Sections 3, 2, 10 and 11, Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon; thence North 00°20' East 2806.3 feet to an iron pipe set at the Northwest corner of the John A. Wren Donation Land Claim, Notification No. 2488; thence South 89°32' East 781.4 feet, along the South line of the Edward Geary Donation Land Claim, to an iron pipe; thence South 2878.8 feet to an iron pipe in the center of County Road; thence, along the center of said County Road, North 79°08' West 158.00 feet; thence, continuing along center of said County Road, North 85°45' West 643.1 feet to the point of beginning.

EXCEPTING that portion lying within the Southern Pacific Railroad right of way line.

PARCEL 8:

Being a part of the Medorem Crawford Donation Land Claim, Notification No. 1034, Claim No. 71, in Section 12, Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, and beginning at a stake set South 00°14' West 423.4 feet and South 74°30' East 3279.0 feet from the Northwest corner of the said Claim; thence South 74°30' East 199.4 feet to the Northwest corner of 5.00 acre tract; thence South 17°44' West, with the West line of 5.00 acre tract, 1602.4 feet to center of County Road and Southwest corner of 5.00 acre tract; thence North 77°16' West, along center of County Road, 20.1 feet; thence North 17°44' East, parallel to and 20 feet from East line, 605.3 feet; thence North 17°44' West, along fence now there, 308.8 feet; thence North 17°44' East, parallel to the East line, 739.8 feet to beginning.

PARCEL 9:

Beginning at a stone 8" x 8" x 18" at the Northeast corner of South half of the Medorem Crawford Donation Land Claim, said beginning corner being the Northwest corner of Lot 11 of Section 12, Township 4 South, Range 3 West, Willamette Meridian,in Yamhill County, Oregon; and running thence North 78°73' West 1989.00 feet; thence North 13° East 30 feet; thence North 77°16' West 136.5 feet; thence North 17°44' East 1595.8 feet; thence South 74°30' East 2671.5 feet to the low water mark on the West bank of the Willamette River; thence, meandering the low water mark of said Willamette River, on the left bank thereof, South 05° East 120.0 feet; South 08° East 500.0 feet; thence South 15° East 600.0 feet; thence South 78°33' East 152.00 feet to an iron bar, 1-1/4" x 6"; thence South 80°34' West 905.80 feet; thence North 77°16' West 489.50 feet to the place of beginning.

PARCEL 10:

Part of the Seward Fulquarts and Flores Fulquarts Donation Land Claim in Sections 1 and 2 and all of Government Lots 4 and 5 in Section 2, all in Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, more particularly described as follows:

Beginning at an iron rod North 89°05' West 136.62 feet from the Northwest corner of Section 1, Township 4 South, Range 3 West of the Willamette Meridian; thence South 89°05' East 811.81 feet, more or less, to an iron pipe on the East line of the former railroad right of way; thence South 01°20' West 346.50 feet to an iron pipe set North 01°20' East 20.5 feet from the center line of the County Road; thence South 89°05' East 1834.00 feet, more or less, to the Willamette River; thence, following the meanderings of said river upstream, to an iron pipe at the Southeast corner of said Seward Fulquarts Donation Land Claim; thence North 74°25'45" West, along the South line of said Fulquarts Donation Land Claim, 4561.07 feet, more or less, to an iron pipe at the Southwest corner of said Seward F. Fulquarts Donation Land Claim; thence North 85°08'30" West 1110.51 feet, more or less, to a granite stone set at the most Easterly boundary corner of the Government resettlement survey of Unit 16; thence North 01°48'40" East 849.20 feet to an iron pipe on the South line of the Flores Fulquarts Donation Land Claim; thence South 89°57' West 224.16 feet to an iron pipe in the County Road, which iron pipe is 14 feet East of the Center line thereof; thence North 02°21' East 1320.00 feet to an iron pipe; thence North 89°42' East 1320.00 feet to an iron pipe on the West line of the Seward Fulquarts Donation Land Claim; thence North 01°48'40" East 792 feet to an iron pipe at the division corner between the North half

**Exhibit 1 - Page 31 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

and the South half of said Seward Fulquarts Donation Land Claim, as per Survey No. 923; thence South 86°13'45" East, along said division line, 1128.60 feet to an iron pipe; thence North 38°48'15" East 423.13 feet to an iron pipe; thence North 03°01'30" East 775.50 feet to the place of beginning.

PARCEL 11:

Beginning at the Northeast corner of the Clifford R. and Gertrude Gibbons Tract, as described in Page 321 of Volume 106, Deed Records, said corner being an iron pipe in the County Road and is referenced by a 3/4 inch WIP 25 feet North and another 3/4 inch WIP 25 feet South, said corner also being the Northwest corner of Unit 18, U.S. Resettlement Tract, and is given in Deed ties as being South 0°29' West 155.1 feet, South 85 ° 45' East 643.1 feet, and South 79°08' East 158.0 feet from the corner to Sections 2, 3 10 and 11, Township 4 South, Range 3 West of the Willamette Meridian in Yamhill County, Oregon; thence, from said point of beginning above described, running South, along the East line of the Gibbons Tract and the West line of Unit 18 of U.S. Resettlement Tract, 2877.7 feet to the Southeast corner of the Gibbons Tract in the Yamhill River; thence South 62°30' West, up said river with the South line of the Gibbons Tract, 697.7 feet; thence North 0°39' West, leaving the River, 141.0 feet to a 7/8 inch soft iron rod, from which Coast and Geodetic Topographic Station marked "DORE 1947", concrete with bronze disk, bears North 26°42' West 30.84 feet; thence North 30°20' East 245.2 feet to a 7/8 inch soft iron rod; thence North 69°40' East 224.25 feet to a 1/2 inch iron rod on right bank of a small branch; thence North 38°40' East 423.3 feet to a 1 inch galvanized iron pipe set firmly in the ground; thence North, parallel with and 22.0 feet West of the East line, 1867.81 feet to a one inch galvanized pipe; thence East 6.0 feet; thence North, parallel with and 16.0 feet West of the East line, 575.19 feet to a point in County Road; thence South 79°08' East 16.29 feet along road to the point of beginning.

PARCEL 12:

Beginning at a 3/4 inch iron pipe at intersection of center line of County Road and West line of Medorem Crawford Donation Land Claim in Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, said point being 2362.73 feet South and 230.49 feet West of the Northeast corner of John A. Wren Donation Land Claim, Notification No. 2488; thence South 88°58' West, along center line of County Road, 213.50 feet to a point; thence South 0°30'41" West 380 feet to a point; thence North 88°58' East 213.50 feet to a point; thence North 0°30'41" East 380.00 feet to the place of beginning.

PARCEL 13:

A part of a tract of land situated in Section 11, Township 4 South, Range 3 West of the Willamette Meridian, in the John A. Wren Donation Land Claim in Yamhill County, Oregon, conveyed to the United States of America by Frank and Minnie Gibbon by Deed recorded March 3, 1937, in Book 112, Page 267, Deed Records, said part being more particularly described as follows:

Beginning at a point marked by a 3/4 inch iron pipe in the center of the County Road, said point being 2343.83 feet South of and 301.68 feet West of the Southwest corner of the F. Fulquarts Donation Land Claim; thence South 0°25'23" West for a distance of 2861.15 feet to a point in the center of the Yamhill River, said point being referenced by a 3/4 inch iron pipe set North 0°26'23" West 60.00 feet and 160.00 feet; thence South 85°02'59" East, along the center line of the Yamhill River, for a distance of 376.15 feet to a point; thence South 54°36'19" East, along the center line of the Yamhill River, for a distance of 584.47 feet to a point, said point being referenced by a 3/4 inch iron pipe set North 0°53'00" West 60.00 feet and a 3/4 inch iron pipe set North 0°20'00" West 160.00 feet; thence, leaving the Yamhill River, North 0°03'55" East for a distance of 560.79 feet to a point marked by a 2 inch iron pipe; thence South 70°52'21" East for a distance of 821.67 feet to a point marked by an iron pipe; thence North 0°30'41" East for a distance of 2573.62 feet to a point; thence South 88°58'00" West for a distance of 213.50 feet to a point; thence North 0°30'41" East for a distance of 380.00 feet to a point on the center line of the County Road; thence South 89°58'00" West, along the center line of the County Road, for a distance of 435.13 feet to a point; thence North 89°11'04" West, along the center line of the County Road, for a distance of 290.19 feet to a point; thence South 81°35'33" West, along the center line of the County Road, for a distance of 390.12 feet to a point; thence North 80°30'22" West, along the center line of the County Road for a distance of 312.22 feet, more or less, to the point of beginning.

EXCEPTING THEREFROM that tract conveyed to Daniel R. Schierhols, et ux, by Deed recorded September 2, 1969, in Film Volume 76, Page 1911, Deed and Mortgage Records, and being more particularly described as follows:

A tract of land situated in Section 11, Township 4 South, Range 3 West of the Willamette Meridian, in Yamhill County, Oregon, more particularly described as follows:

**Exhibit 1 - Page 32 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

Beginning at a point marked by a 3/4 inch iron pipe in the center of the County Road, said point being 2343.83 feet South of and 301.68 feet West of the Southwest corner of the F. Fulquarts Donation Land Claim, said point being the Northwest corner of Unit 18, U.S. Resettlement; thence South 80°30' East, along the center line of said road, 312.22 feet; thence, continuing along said center line, North 81°35' East 24.4 feet; thence South 0°26-1/2' West 171.32 feet; thence South 85°24' West 333.3 feet to the West line of said Unit 18; thence North 0°26-1/2' East 245.0 feet to the place of beginning.

together with all and singular the tenements, hereditaments and appurtenances and all other rights belonging or in anyway now or after appertaining, and the rents, issues and profits and all fixtures used in connection with the property.

FOR THE PURPOSE OF SECURING PERFORMANCE of each agreement of grantor and payment of the sum of ($4,500,000.00) Four Million Five Hundred Thousand and No Dollars and 00/100 Dollars, with the interest according to the terms of a promissory note of even date, payable to beneficiary and made by grantor, the final payment of principal and interest, if not sooner paid, to be due and payable June 1, 2027.

The date of maturity of the debt secured by this instrument is the date, stated above, on which the final installment of the note becomes due and payable. **In the event the within described property, or any interest therein is sold, agreed to be sold, conveyed, assigned or alienated by grantor without first having obtained the written consent or approval of the beneficiary, then at the beneficiary's option, all obligations secured by this instrument, irrespective of the maturity dates expressed, shall become immediately due and payable.**
To protect the security of this trust deed, grantor agrees:

1. To protect, preserve and maintain the property in good condition and repair; not to remove or demolish any building or improvement; not to commit or permit any waste of the property.

2. To complete or restore promptly and in good and habitable conditions any building or improvement which now exists or may be constructed, and which is damaged or destroyed, and pay when due all costs incurred.

3. To comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the property; if the beneficiary so requests, to join in executing such financing statements pursuant to the Uniform Commercial Code as the beneficiary may require and to pay for filing the same in the proper public office or offices, as well as the cost of all lien searches made by filing officers or searching agencies as may be deemed desirable by the beneficiary.

4. To provide and continuously maintain insurance on the buildings now or hereafter erected on the property against loss or damage by fire and such other hazards as the beneficiary may from time to time require, in an amount not less than the full insurable value, written in companies acceptable to the beneficiary, with loss payable to the latter; all policies of insurance shall be delivered to the beneficiary as soon as insured; if the grantor shall fail for any reason to procure any such insurance and to deliver the policies to the beneficiary at least fifteen days prior to the expiration of any policy of insurance now or hereafter placed on the buildings, the beneficiary may procure the same at grantor's expense. The amount collected under any fire or other insurance policy may be applied by beneficiary upon any indebtedness secured and in such order as beneficiary may determine, or at the option of beneficiary the entire amount so collected, or any part, may be released to grantor. Such application or release shall not cure or waive any default or notice of default or invalidate any act done pursuant to such notice.

5. To keep the property free from construction liens and to pay all taxes, assessments and other charges assessed upon or against the property before any part of such taxes, assessments and other charges become past due or delinquent and promptly delivered receipts to beneficiary; should the grantor fail to make payment of any taxes, assessments, insurance premiums, liens or other charges payable by grantor, either by direct payment or by providing beneficiary with funds with which to make such payment, beneficiary may, at its option, make payment, and the amount so paid, with interest at the rate set forth in the note secured, together with the obligations described in paragraphs 6 and 7 of this trust deed, shall be added to and become a part of the debt secured by this trust deed, without waiver of any rights arising from breach of any of the covenants and for such payments, with interest as aforesaid, the property described, as well as the grantor, shall be bound to the same extent that they are bound for the payment of the obligation described, and all such payments shall be immediately due and payable without notice, and the nonpayable shall, at the option of the beneficiary, render all sums secured by this trust deed immediately due and payable and constitute a breach of this trust deed.

6. To pay all costs, fees and expenses of this trust including the cost of title search as well as other costs and expenses of the trustee incurred in connection with or in enforcing this obligation and trustee's fees and attorney's fees actually incurred.

7. To appear in and defend any action or proceeding purporting to affect the security rights or powers of beneficiary or trustee; and in any suit, action or proceeding in which the beneficiary or trustee may appear, including any suit for the foreclosure of this trust deed, to pay all costs and expenses, including evidence of title and the beneficiary's or trustee's attorney's fees; the amount of attorney's fees mentioned in this paragraph 7 in all cases shall be fixed by the trial court and in the

**Exhibit 1 - Page 33 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

event of any appeal from any judgment or decree of the trial court, grantor further agrees to pay such sum as the appellate court shall adjudge reasonable as the beneficiary's or trustee's attorney's fees on such appeal.

It is mutually agreed that:

8. In the event that any portion or all of the property shall be taken under the right of eminent domain or condemnation, beneficiary shall have the right, if it so elects, to require that all or any portion of the monies payable as compensation for such taking which are in excess of the amount required to pay all reasonable costs, expenses and attorney's fees necessarily paid by grantor in such proceedings, shall be paid to beneficiary and applied by it first upon any reasonable costs and expenses and attorney's fees, both in the trial and appellate courts, necessarily paid or incurred by beneficiary in such proceedings, and the balance applied upon the indebtedness secured; and grantor agrees, at its own expense, to take such actions and execute such instruments shall be necessary in obtaining such compensation, promptly upon beneficiary's request.

9. At any time and from time to time upon written request of beneficiary, payment of its fees and presentation of this deed and the note for endorsement (in case of full reconveyances, for cancellation), without affecting the liability of any person for the payment of the indebtedness, trustee may (a) consent to the making of any map or plat of the property; (b) join in granting any easement or creating any restriction; (c) join in any subordination or other agreement affecting this deed or the lien or charge; (d) reconvey, without warranty, all or any part of the property. The grantee in any reconveyance may be described as the "person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness.

10. Upon any default by grantor, beneficiary may at any time by receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness secured, enter upon and take possession of the property or any part, in its own name sue or otherwise collect rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees upon any indebtedness secured, and in such order as beneficiary may determine.

11. The entering upon and taking possession of the property, the collection of such rents, issues and profits, or the proceeds of fire and other insurance policies or compensation or awards for any taking or damage of the property, and the application or release, shall not cure or waive any default or invalidate any act done pursuant to such notice.

12. Upon default by grantor in payment of any indebtedness secured or in grantor's performance of any agreement, time being of the essence with respect to such payment and/or performance, the beneficiary may declare all sums secured immediately due and payable. In such an event the beneficiary may elect to proceed to foreclose this trust deed in equity as a mortgage or direct the trustee to foreclose this trust deed by advertisement and sale, or may direct the trustee to pursue any other right or remedy, either at law or in equity, which the beneficiary may have. In the event the beneficiary elects to foreclose by advertisement and sale, the beneficiary or the trustee shall execute and cause to be recorded a written notice of default and election to sell the property to satisfy the obligation secured and the trustee shall fix the time and place of sale, give notice as then required by law and proceed to foreclose this trust deed in the manner provided by law.

13. After the trustee has commenced foreclosure by advertisement and sale, and at any time prior to the time provided by law before the date the trustee conducts the sale, the grantor or any other person so privileged, may cure the default or defaults. If the default consists of a failure to pay, when due, sums secured by the trust deed, the default may be cured by paying the entire amount due at the time of the cure other than such portion as would not then be due had no default occurred. Any other default that is capable of being cured may be cured by tendering the performance required under the obligation or trust deed. In any case, in addition to curing the default or defaults, the person effecting the cure shall pay to the beneficiary all costs and expenses actually incurred in enforcing the obligation of the trust deed together with trustee's and attorney's fees not exceeding the amounts provided by law.

14. Otherwise, the sale shall be held on the date and at the time and place designated in the notice of sale or the time to which the sale may be postponed as provided by law. The trustee may sell the property either in one parcel or in separate parcels, and shall sell the parcel or parcels at auction to the highest bidder for cash, payable at the time of sale. Trustee shall deliver to the purchaser its deed in form as required by law conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in the deed of any matters of fact shall be conclusive proof of their truthfulness. Any person, excluding the trustee, but including the grantor and beneficiary may purchase at the sale.

15. When trustee sells pursuant to the powers provided, trustee shall apply the proceeds of sale to payment of (1) the expenses of sale, including the compensation of the trustee and a reasonable charge by trustee's attorney, (2) to the obligation secured by the trust deed, (3) to all persons having recorded liens subsequent to the interest of the trustee in the trust deed as their interests may appear in the order of their priority and (4) the surplus, if any, to the grantor or to any successor in interest entitled to such surplus.

16. Beneficiary may from time to time appoint a successor or successors to any trustee named or to

**Exhibit 1 - Page 34 of 43**

Case 14-36770-rld11    Doc 71    Filed 04/23/15

any successor trustee appointed. Upon such appointment, and without conveyance to the successor trustee, the latter shall be vested with all title, powers and duties conferred upon any trustee named or appointed. Each such appointment and substitution shall be made by written instrument executed by beneficiary, which, when recorded in the records of the county or counties in which the property is situated, shall be conclusive proof of proper appointment of the successor trustee.

17. Trustee accepts this trust when this deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party of pending sale under any other deed of trust or of any action proceeding in which grantor, beneficiary or trustee shall be a party unless such action or proceeding is brought by trustee.

The grantor covenants and agrees to and with the beneficiary and the beneficiary's successor in interest that the grantor is lawfully seized in fee simple of the real property and has a valid, unencumbered title, excepting and subject to:
Trust Deed in the first lien:
Amount: $10,200,000.00
Dated: June 20, 2011
Mortgagor: Delford M. Smith (individually, and dba as both Greenpatch and DMS properties), Ventures Acquisition Company, LLC a Delaware limited liability company, and Delford M. SMith, Trustee of the Delford M. Smith Revocable Trust created under restted trust agreement dated February 29, 1996
Mortgagee: Zions First National Bank
Loan No.: 21112079
Recording Date: June 27, 2011
Recording No: 201107865
and that the grantor will warrant and forever defend the same against all persons.

Trust Deed in the second lien:
Amount: $1,500,000.00
Dated: November 13, 2013
Mortgagor: Delford M. Smith, Trustee of the Delford M. Smith Revocable Trust created under restated trust agreement dated February 29, 1996
Mortgagee: Maria's Chance Delford, LLC, a Delware limited liability company
Recording Date: November 13, 2013
Recording No: 2013I7338
And that the grantor will warrant and forever defend the same against all persons.

The grantor warrants that the proceeds of the loan represented by the above described note and this trust deed are:

(a)*. ~~primarily for grantor's personal, family or household purposes (see Important Notice below).~~

(b) for an organization, or (even if grantor is a natural person) are for business or commercial purposes.

This deed applies to, insures to the benefit of and binds all parties, their heirs, legatees, devisees, administrators, executors, personal representatives, successors and assigns. The term beneficiary shall mean the holder and owner, including pledges, of the contract secured, whether or not named as a beneficiary.

In construing this trust deed, it is understood that the Grantor or Beneficiary may be more than one person; that if the context so requires, the singular shall be taken to mean and include that plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions apply equally to corporations and to individuals.

Note: The Trust Deed Act provides that the trustee must be either an attorney, who is an active member of the Oregon State Bar, a bank, a trust company or savings and loan association authorized to do business under the laws of Oregon or the United States, a title insurance company authorized to insure title to real property of this state, its subsidiaries, affiliates, agents or branches, the United States or any agency thereof, or an escrow agent licensed under state law.

*IMPORTANT NOTICE: Delete, by lining out, whichever warranty (a) or (b) is not applicable; if warranty (a) is applicable and the beneficiary is a creditor as such word is defined in the Truth-in-Lending Act Regulation Z, the beneficiary MUST comply with the Act and Regulation by making required disclosure. If compliance with the Act is not required, disregard this notice.

WARNING
Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.
You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the

**Exhibit 1 - Page 35 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

DATED: November 13, 2013

The Delford M. Smith Revocable Trust created under restated trust agreement dated February 29, 1996

_____
Delford M. Smith, Trustee

State of OREGON

COUNTY of Yamhill

This instrument was acknowledged before me on November 13, 2013

by Delford M. Smith, Trustee of the Delford M. Smith Revocable Trust created under restated trust agreement dated February 29, 1996.

_____, Notary Public - State of Oregon
My commission expires: March 20, 2016

OFFICIAL SEAL
LYNNETTE A SCOTT
NOTARY PUBLIC - OREGON
COMMISSION NO. 466863
MY COMMISSION EXPIRES MARCH 20, 2016

**Exhibit 1 - Page 36 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

## REQUEST FOR FULL RECONVEYANCE

Chicago Title Insurance Company, TRUSTEE:

The undersigned is the legal owner and holder of all indebtedness secured by the within Deed of Trust. All sums secured by the Deed of Trust have been fully paid and satisfied; and you are requested and directed, on payment to you of any sums owing you under the terms of the Deed of Trust, to cancel all evidences of indebtedness, secured by the Deed of Trust, delivered to you, together with the Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of the Deed of Trust, all the estate now held by you under the same.

Dated _____

_____          _____

By: _____          By: _____

Please mail Reconveyance to:

_____

Do not lose or destroy this Deed of Trust OR THE NOTE which it secures. Both original documents must be delivered to the Trustee for cancellation before reconveyance will be made.

STATE OF OREGON
COUNTY OF _____

This instrument was acknowledged before me on _____, 20_____ by _____ as _____ of _____.

_____
Notary Public – State of Oregon

**Exhibit 1 - Page 37 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

RECORDING REQUESTED BY:
Ticor Title Company
105 NE 4th Street
McMinnville, OR 97128
AFTER RECORDING RETURN TO:
Skadden, Arps, Slate, Meagher & Flom, LLP
Four Times Square
New York, NY 10036-6552
Escrow No: 471814030084-TTMIDWIL36

| Yamhill County Official Records | **201401006** |
| DMR-DTDMR | |
| Stn=4 MILLSA | 01/29/2014 09:06:43 AM |
| 5Pgs $25.00 $11.00 $5.00 $20.00 | **$61.00** |

I, Brian Van Bergen, County Clerk for Yamhill County, Oregon, certify that the instrument identified herein was recorded in the Clerk records.

Brian Van Bergen - County Clerk

TICOR TITLE COMPANY 471814030084

# TRUST DEED

THIS TRUST DEED, made on the 24 January, 2014, between Riverwood Road Farm LLC, as Grantor, Ticor Title, as Trustee and Skadden, Arps, Slate, Meagher & Flom, LLP, as Beneficiary,
WITNESSETH:

Grantor irrevocably grants, bargains, sells and conveys to trustee in trust, with power of sale, the property in Dundee, Oregon, described as:

Land situated in the County of Yamhill and State of Oregon, described as follows:

BEGINNING at an Oak Stake South 13° West 30 feet from a stone that marks the Northeast corner of County Survey No. 80-C as of record in Book "D" on Page 213 of Records of County Surveys of Yamhill County, Oregon, and stone being 2909.7 feet South and 299536 feet East of the Northwest corner of the Mediocre Crawford Donation Land Claim Notification No. 1034, Claim No. 71, in Township 4 South, Range 3 West of the Willamette Meridian in Yamhill County. Oregon; thence South 13° West 2755.25 feet to the bank of the Yamhill River, where an iron bar marking the Southeast corner of County Survey No. 80-C bears North 13° East 50.75 feet; thence meandering down the bank of the Yamhill River and the Willamette River as follows: South 65° East 349.67 feet; South 63° 04' East 703.20 feet; South 56° 59' East 402.13 feet; thence South 53° 55' East 612.50 feet; thence South 65° 49' East 808.90 feet; thence South 78° 38' East 415.70 feet; thence East 310.92 feet; thence North 80° 20' East 402 feet; thence North 57° 40' East 429.30 feet; North 21° 16' East 484.90 feet; North 18° East 650.50 feet; North 18° 49' East 417.65 feet; North 00° 29' East 373.40 feet; North 12° 18' East 689.10 feet; North 35° 56' West 1027.40 feet; North 39° 64' West 182.10 feet; to an iron bar, set on the bank of the Willamette River, which iron bar is 1 1/4 x 6"; thence South 80° 34' West 905.80 feet to a marked oak fence post; thence North 77° 16' West 489.60 feet to a marked stone 8" x 8" set at the Northeast corner of the South half of the Donation Land Claim of Mediocre Crawford and wife, Notification No. 1034, Claim No. 71; thence North 78° 13' West 1989.00 feet to the Place of Beginning.

SAVING AND EXCEPTING therefrom a strip of land 40 feet wide and 1000 feet long off the West side of the above described real property conveyed to Yamhill County for road purposes by deed recorded September 21, 1931 in Book 106, Page 5, Deed Records of Yamhill County, Oregon.

together with all and singular the tenements, hereditaments and appurtenances and all other rights belonging or in anyway now or after appertaining, and the rents, issues and profits and all fixtures used in connection with the property.

FOR THE PURPOSE OF SECURING PERFORMANCE of each agreement of grantor and payment of the sum of ($5,500,000.00)) Five Million Five Hundred Thousand and No Dollars and 00/100 Dollars, with the interest according to the terms of a promissory note of even date, payable to beneficiary and made by grantor, the final payment of principal and interest, if not sooner paid, to be due and payable January 31, 2017.

The date of maturity of the debt secured by this instrument is the date, stated above, on which the final installment of the note becomes due and payable. **In the event the within described property, or any interest therein is sold, agreed to be sold, conveyed, assigned or alienated by grantor without first having obtained the written consent or approval of the beneficiary, then at the beneficiary's option, all obligations secured by this instrument, irrespective of the maturity dates expressed, shall become immediately due and payable.**
To protect the security of this trust deed, grantor agrees:

1. To protect, preserve and maintain the property in good condition and repair; not to remove or demolish any building or improvement; not to commit or permit any waste of the property.

2. To complete or restore promptly and in good and habitable conditions any building or improvement which now exists or may be constructed, and which is damaged or destroyed, and pay when due all costs incurred.

3. To comply with all laws, ordinances, regulations, covenants, conditions and restrictions affecting the property; if the beneficiary so requests, to join in executing such financing statements pursuant to the Uniform Commercial Code as the beneficiary may require and to pay for filing the same in the proper public office or offices, as well as the cost of all lien searches made by filing officers or searching agencies as may be deemed desirable by the beneficiary.

**Exhibit 1 - Page 38 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

4.   To provide and continuously maintain insurance on the buildings now or hereafter erected on the property against loss or damage by fire and such other hazards as the beneficiary may from time to time require, in an amount not less than the full insurable value, written in companies acceptable to the beneficiary, with loss payable to the latter; all policies of insurance shall be delivered to the beneficiary as soon as insured; if the grantor shall fail to procure any such insurance and to deliver the policies to the beneficiary at least fifteen days prior to the expiration of any policy of insurance now or hereafter placed on the buildings, the beneficiary may procure the same at grantor's expense. The amount collected under any fire or other insurance policy may be applied by beneficiary upon any indebtedness secured and in such order as beneficiary may determine, or at the option of beneficiary the entire amount so collected, or any part, may be released to grantor. Such application or release shall not cure or waive any default or notice of default or invalidate any act done pursuant to such notice.

5.   To keep the property free from construction liens and to pay all taxes, assessments and other charges assessed upon or against the property before any part of such taxes, assessments and other charges become past due or delinquent and promptly delivered receipts to beneficiary; should the grantor fail to make payment of any taxes, assessments, insurance premiums, liens or other charges payable by grantor, either by direct payment or by providing beneficiary with funds with which to make such payment, beneficiary may, at its option, make payment, and the amount so paid, with interest at the rate set forth in the note secured, together with the obligations described in paragraphs 6 and 7 of this trust deed, shall be added to and become a part of the debt secured by this trust deed, without waiver of any rights arising from breach of any of the covenants and for such payments, with interest as aforesaid, the property described, as well as the grantor, shall be bound to the same extent that they are bound for the payment of the obligation described, and all such payments shall be immediately due and payable without notice, and the nonpayable shall, at the option of the beneficiary, render all sums secured by this trust deed immediately due and payable and constitute a breach of this trust deed.

6.   To pay all costs, fees and expenses of this trust including the cost of title search as well as other costs and expenses of the trustee incurred in connection with or in enforcing this obligation and trustee's fees and attorney's fees actually incurred.

7.   To appear in and defend any action or proceeding purporting to affect the security rights or powers of beneficiary or trustee; and in any suit, action or proceeding in which the beneficiary or trustee may appear, including any suit for the foreclosure of this trust deed, to pay all costs and expenses, including evidence of title and the beneficiary's or trustee's attorney's fees; the amount of attorney's fees mentioned in this paragraph 7 in all cases shall be fixed by the trial court and in the event of any appeal from any judgment or decree of the trial court, grantor further agrees to pay such sum as the appellate court shall adjudge reasonable as the beneficiary's or trustee's attorney's fees on such appeal.
     It is mutually agreed that:

8.   In the event that any portion or all of the property shall be taken under the right of eminent domain or condemnation, beneficiary shall have the right, if it so elects, to require that all or any portion of the monies payable as compensation for such taking which are in excess of the amount required to pay all reasonable costs, expenses and attorney's fees necessarily paid by grantor in such proceedings, shall be paid to beneficiary and applied by it first upon any reasonable costs and expenses and attorney's fees, both in the trial and appellate courts, necessarily paid or incurred by beneficiary in such proceedings, and the balance applied upon the indebtedness secured; and grantor agrees, at its own expense, to take such actions and execute such instruments shall be necessary in obtaining such compensation, promptly upon beneficiary's request.

9.   At any time and from time to time upon written request of beneficiary, payment of its fees and presentation of this deed and the note for endorsement (in case of full reconveyances, for cancellation), without affecting the liability of any person for the payment of the indebtedness, trustee may (a) consent to the making of any map or plat of the property; (b) join in granting any easement or creating any restriction; (c) join in any subordination or other agreement affecting this deed or the lien or charge; (d) reconvey, without warranty, all or any part of the property. The grantee in any reconveyance may be described as the "person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness.

10.  Upon any default by grantor, beneficiary may at any time by receiver to be appointed by a court, and without regard to the adequacy of any security for the indebtedness secured, enter upon and take possession of the property or any part, in its own name sue or otherwise collect rents, issues and profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including reasonable attorney's fees upon any indebtedness secured, and in such order as beneficiary may determine.

11.  The entering upon and taking possession of the property, the collection of such rents, issues and profits, or the proceeds of fire and other insurance policies or compensation or awards for any taking or damage of the property, and the application or release, shall not cure or waive any default or invalidate any act done pursuant to such notice.

12.  Upon default by grantor in payment of any indebtedness secured or in grantor's performance of

**Exhibit 1 - Page 39 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

any agreement, time being of the essence with respect to such payment and/or performance, the beneficiary may declare all sums secured immediately due and payable. In such an event the beneficiary may elect to proceed to foreclose this trust deed in equity as a mortgage or direct the trustee to foreclose this trust deed by advertisement and sale, or may direct the trustee to pursue any other right or remedy, either at law or in equity, which the beneficiary may have. In the event the beneficiary elects to foreclose by advertisement and sale, the beneficiary or the trustee shall execute and cause to be recorded a written notice of default and election to sell the property to satisfy the obligation secured and the trustee shall fix the time and place of sale, give notice as then required by law and proceed to foreclose this trust deed in the manner provided by law.

13. After the trustee has commenced foreclosure by advertisement and sale, and at any time prior to the time provided by law before the date the trustee conducts the sale, the grantor or any other person so privileged, may cure the default or defaults. If the default consists of a failure to pay, when due, sums secured by the trust deed, the default may be cured by paying the entire amount due at the time of the cure other than such portion as would not then be due had no default occurred. Any other default that is capable of being cured may be cured by tendering the performance required under the obligation or trust deed. In any case, in addition to curing the default or defaults, the person effecting the cure shall pay to the beneficiary all costs and expenses actually incurred in enforcing the obligation of the trust deed together with trustee's and attorney's fees not exceeding the amounts provided by law.

14. Otherwise, the sale shall be held on the date and at the time and place designated in the notice of sale or the time to which the sale may be postponed as provided by law. The trustee may sell the property either in one parcel or in separate parcels, and shall sell the parcel or parcels at auction to the highest bidder for cash, payable at the time of sale. Trustee shall deliver to the purchaser its deed in form as required by law conveying the property so sold, but without any covenant or warranty, express or implied. The recitals in the deed of any matters of fact shall be conclusive proof of their truthfulness. Any person, excluding the trustee, but including the grantor and beneficiary may purchase at the sale.

15. When trustee sells pursuant to the powers provided, trustee shall apply the proceeds of sale to payment of (1) the expenses of sale, including the compensation of the trustee and a reasonable charge by trustee's attorney, (2) to the obligation secured by the trust deed, (3) to all persons having recorded liens subsequent to the interest of the trustee in the trust deed as their interests may appear in the order of their priority and (4) the surplus, if any, to the grantor or to any successor in interest entitled to such surplus.

16. Beneficiary may from time to time appoint a successor or successors to any trustee named or to any successor trustee appointed. Upon such appointment, and without conveyance to the successor trustee, the latter shall be vested with all title, powers and duties conferred upon any trustee named or appointed. Each such appointment and substitution shall be made by written instrument executed by beneficiary, which, when recorded in the records of the county or counties in which the property is situated, shall be conclusive proof of proper appointment of the successor trustee.

17. Trustee accepts this trust when this deed, duly executed and acknowledged, is made a public record as provided by law. Trustee is not obligated to notify any party of pending sale under any other deed of trust or of any action proceeding in which grantor, beneficiary or trustee shall be a party unless such action or proceeding is brought by trustee.

The grantor covenants and agrees to and with the beneficiary and the beneficiary's successor in interest that the grantor is lawfully seized in fee simple of the real property and has a valid, unencumbered title, excepting and subject to:
2012-2013 and 2013-2014 Property Taxes
and that the grantor will warrant and forever defend the same against all persons.

Trust Deed
Amount: $400,000.00
Dated: January _____, 2014
Grantor: Riverwood Road Farm, LLC
Beneficiary: Jim Ray
Recording Date: January _____, 2014
Recorded: January _____, 2014

The grantor warrants that the proceeds of the loan represented by the above described note and this trust deed are:

(a)*. ~~primarily for grantor's personal, family or household purposes (see Important Notice below),~~

(b) for an organization, or (even if grantor is a natural person) are for business or commercial purposes.

**Exhibit 1 - Page 40 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

This deed applies to, insures to the benefit of and binds all parties, their heirs, legatees, devisees, administrators, executors, personal representatives, successors and assigns. The term beneficiary shall mean the holder and owner, including pledges, of the contract secured, whether or not named as a beneficiary.

In construing this trust deed, it is understood that the Grantor or Beneficiary may be more than one person; that if the context so requires, the singular shall be taken to mean and include that plural, and that generally all grammatical changes shall be made, assumed and implied to make the provisions apply equally to corporations and to individuals.

Note: The Trust Deed Act provides that the trustee must be either an attorney, who is an active member of the Oregon State Bar, a bank, a trust company or savings and loan association authorized to do business under the laws of Oregon or the United States, a title insurance company authorized to insure title to real property of this state, its subsidiaries, affiliates, agents or branches, the United States or any agency thereof, or an escrow agent licensed under state law.

*IMPORTANT NOTICE: Delete, by lining out, whichever warranty (a) or (b) is not applicable; if warranty (a) is applicable and the beneficiary is a creditor as such word is defined in the Truth-in-Lending Act Regulation Z, the beneficiary MUST comply with the Act and Regulation by making required disclosure. If compliance with the Act is not required, disregard this notice.

WARNING

Unless you provide us with evidence of the insurance coverage as required by our contract or loan agreement, we may purchase insurance at your expense to protect our interest. This insurance may, but need not, also protect your interest. If the collateral becomes damaged, the coverage we purchase may not pay any claim you make or any claim made against you. You may later cancel this coverage by providing evidence that you have obtained property coverage elsewhere.

You are responsible for the cost of any insurance purchased by us. The cost of this insurance may be added to your contract or loan balance. If the cost is added to your contract or loan balance, the interest rate on the underlying contract or loan will apply to this added amount. The effective date of coverage may be the date your prior coverage lapsed or the date you failed to provide proof of coverage.

The coverage we purchase may be considerably more expensive than insurance you can obtain on your own and may not satisfy any need for property damage coverage or any mandatory liability insurance requirements imposed by applicable law.

DATED: January _24_ , 2014

Riverwood Road Farm LLC, an Oregon Limited
Liability Company

BY: _Delford M. Smith_
Delford M. Smith, Member

State of OREGON

COUNTY of YAMHILL

This instrument was acknowledged before me on January _24_ , 2014 by Delford M. Smith, Member for Riverwood Road Farm, LLC, an Oregon Limited Liability Company.

_Lynnette A Scott_ , Notary Public - State of Oregon
My commission expires: _March 20, 2016_

OFFICIAL SEAL
LYNNETTE A SCOTT
NOTARY PUBLIC - OREGON
COMMISSION NO. 466863
MY COMMISSION EXPIRES MARCH 20, 2016

**Exhibit 1 - Page 41 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

## REQUEST FOR FULL RECONVEYANCE

Chicago Title Insurance Company, TRUSTEE:

The undersigned is the legal owner and holder of all indebtedness secured by the within Deed of Trust. All sums secured by the Deed of Trust have been fully paid and satisfied; and you are requested and directed, on payment to you of any sums owing you under the terms of the Deed of Trust, to cancel all evidences of indebtedness, secured by the Deed of Trust, delivered to you, together with the Deed of Trust, and to reconvey, without warranty, to the parties designated by the terms of the Deed of Trust, all the estate now held by you under the same.

Dated _____

_____        _____

By: _____        By: _____

Please mail Reconveyance to:

_____

Do not lose or destroy this Deed of Trust OR THE NOTE which it secures. Both original documents must be delivered to the Trustee for cancellation before reconveyance will be made.

STATE OF OREGON
COUNTY OF _____

This instrument was acknowledged before me on _____, 20 _____ by _____ as _____ of _____.

_____
Notary Public – State of Oregon

**Exhibit 1 - Page 42 of 43**
Case 14-36770-rld11    Doc 71    Filed 04/23/15

# SCHEDULE 4

# RELEASED PARTIES

- Evergreen Vintage Aircraft, Inc.
- Evergreen Holdings, Inc.
- Evergreen Agricultural Enterprises, Inc.
- Ventures Acquisition Company, LLC
- Ventures Holdings, Inc.
- The Michael King Smith Foundation
- The Estate of Delford M. Smith
- The Delford M. Smith Revocable Trust
- Evergreen Aviation and Space Museum and The Captain Michael King Smith Education Institute
- Umpqua Bank
- Alfred T. Giuliano, as Chapter 7 Trustee for the Chapter 7 Debtors
- Andrew Martin
- The CFA Foundation
- Skadden, Arps, Slate, Meagher & Flom LLP
- Jay Goffman
- Susan Goffman
- James E. Ray
- Lisa Anderson
- Maria's Chance Delford LLC